*(Criminal Court of Cook County.)*

## The People of the State of Illinois

### vs.

### William J. Davis.

(June 14, 1906.)

1. CHANGE OF VENUE—LOCAL PREJUDICE. A change of venue will seldom be granted from a large city where many men are eligible for jury service; but where the defense presents over 12,000 affidavits as to the existence of prejudice, and the state about 4,000 counter affidavits, the change of venue must be granted.

2. SAME—APPLICATION FOR—MERE NUMBER OF AFFIDAVITS. Mere numbers alone of affidavits that the defendant cannot receive a fair trial in the county do not govern the granting of the change of venue, but the character and reputation of the persons making the affidavits will be considered.

3. SAME—CHARACTER AND NUMBER OF AFFIDAVITS. Where vast numbers of affidavits of prejudice are presented, among which are those of large numbers of prominent men, the court will grant the change of venue, and such a record is conclusive upon the court that prejudice still exists although the catastrophe for which the defendant was indicted occurred a year or more previous.

Indictment for manslaughter. Motion for change of venue from Cook county, Illinois, on the ground of local prejudice. P. G. D. No. 76,382. Heard before Judge Ben. M. Smith.

Statement of facts.

William J. Davis, as manager of the Iroquois Theatre, was indicted on February 25, 1904, for manslaughter as the result of a fire in the Iroquois Theatre building, in the city of Chicago, on December 30, 1903, by which several hundred persons lost their lives, due, it was alleged, to the failure of the owners and managers of the theatre building to comply with the building ordinances of the city of Chicago, etc. This indictment was quashed by Judge Kersten of the criminal court of Cook county on February 9, 1905. Subsequently on March 4, 1905, a second indictment was returned against Will. J. Davis, charging him with manslaughter as the result

of the same fire. A petition for a change of venue from
Cook county on account of the prejudice of the inhabitants
was filed on March 10, 1905, and a motion to quash the sec-
ond indictment was filed. The motion to quash was heard
in June, 1905, and on January 23, 1906, the motion to quash
was denied as to certain of the counts and granted as to
others. The motion for a change of venue was heard by the
criminal court in June, 1906. The petition for a change of
venue alleged that Will J. Davis had for many years been
connected with the management of various theatres in the city
of Chicago, and that he was by name and reputation well
known to a large part of the inhabitants of the city of Chi-
cago and Cook county; that the Iroquois Theatre in Chicago
was on November 23, 1903, opened to the public for the first
time after much advertisement and that said opening at-
tracted great public attention; that on the afternoon of De-
cember 30, 1903, a fire occurred in the Iroquois Theatre dur-
ing the course of the matinee performance, and as a result
of this fire five hundred and ninety-seven men, women and
children lost their lives; that after said fire the hospitals and
morgues in Cook county were filled with the dead and dying
alleged to have come from said theatre building, and that
many tens of thousands of people congregated for days about
the hospitals, etc., inquiring for persons supposed to have
died or been injured in the fire, and that as a result the in-
habitants of Cook county were wrought up to a high pitch of
excitement; that immediately after the fire the mayor of Chi-
cago issued a proclamation with reference to and directing
that a day be set apart for mourning and asking that business
be suspended, and that such proclamation was generally ob-
served; that the fire and its consequences was then the para-
mount topic of conversation by the inhabitants of Cook
county; that immediately after the fire on January 1, 1904,
the mayor of Chicago ordered closed all the twenty-five to
thirty theatres in the city of Chicago, for the reason that all
of the theatres were violating the ordinances of the city of
Chicago; that immediately after the fire there was formed
an association designated as the "Iroquois Memorial Associ-

ation," which had been publishing a great amount of litera-
ture calling the attention of the inhabitants of Cook county
to the petitioner, and charging the petitioner and other per-
sons with gross negligence, carelessness and wilful intentions
and claiming that the petitioner was guilty of causing the
great loss of life by reason of the fire and that similar charges
were made by ministers from their pulpits, and by school
teachers to their pupils; that on January 7, 1904, the coroner
of Cook county held a coroner's inquest over the victims of
the fire; that the inquest was held in the city council cham-
ber of Chicago, and that many thousands of inhabitants of
Cook county attended said inquest and heard the testimony,
and that between two and three hundred witnesses were called
to testify at said inquest and that one hundred and seventy
witnesses actually did testify; that the inquest covered a pe-
riod of twenty days and the testimony was published *verbatim*
or in substance in all the daily newspapers in Chicago; that
the daily newspapers of Chicago had enormous circulation
and reached amounting to almost one million five hundred
thousand copies per day, and that immediately after the fire
their newspapers devoted many editions to publishing ac-
counts of occurrences at the fire, and alleged that the loss of
life was occasioned by the negligence of the petitioner; that
the newspapers alleged in great detail heart-rending occur-
rences at the fire and the various defects alleged to exist in the
theatre building and its management and construction; that
the newspapers published that the petitioner with others,
including the fire inspector and building inspector and the
mayor of the city of Chicago, were responsible for the hun-
dreds of deaths from the fire; and published statements such
as that "nearly all exits save the main doors were locked,"
etc., and that their statements were published and printed
in large bold type and head-lines upon the first pages; and
that large pictures were published showing horrible scenes at
the fire; that lists of names of the injured and dead were pub-
lished; that it was published that the laws and building ordi-
nances of the city of Chicago were violated by the petitioner
in the construction and operation of the theatre; that on De-

cember 31, 1903, certain employes of the theatre were placed under arrest, and that the news of the arrests was heralded and published in the newspapers; that all these things incited the public mind and prejudice against the petitioner; that a coroner's jury was summoned on January 1, 1904, to investigate into the catastrophe, and that its proceedings were published at length in the newspapers; that on January 2, 1904, the petitioner with others was arrested for manslaughter and great publicity was given to the arrest; that other arrests were made; that great numbers of damage suits were instituted against the petitioner and others arising out of the fire; that many pictures of the injured were published in the newspapers; that from January 8, 1904, almost continuously certain newspapers continued to publish statements charging the petitioner as the cause of the catastrophe; that on January 25, 1904, the coroner's jury held eight persons to the grand jury, including the petitioner, the mayor, building commissioner, and chief of the fire department of the city of Chicago, which was published at length in the newspapers; that on February 25, 1904, the petitioner was indicted together with others for manslaughter as the result of the fire; that all the time the newspapers printed articles derogatory to the petitioner, which incited in the minds of the inhabitants of Cook county great prejudice against the petitioner; that no steps were taken in the cases until September 28, 1904; that in the meantime the Iroquois Memorial Association circulated large numbers of articles and letters to the inhabitants of Cook county, asking for contributions of funds to assist in the prosecution of the petitioner; that in the meantime many articles and pictures were published in the papers tending to excite the public mind against the petitioner. That on October 4, 1904, a change of venue was granted to two co-defendants with petitioner; that on October 4, 1904, petitioner moved to quash the indictment against him and the motion to quash was argued on November 1 and 2, 1904; that on February 9, 1905, the indictment was quashed by Judge Kersten; that immediately after the quashing of the indictment a grand jury was impanelled on February 20, 1905, and on March 4, 1905, a

second indictment was returned charging the petitioner with manslaughter as the result of deaths due to the fire; that several hundred damage suits (in one day as many as sixty, asking damages amounting to $500,000) were started against petitioner, and the institution of such suits was given great publicity by the press of the city of Chicago; that 600 persons lost their lives in the fire, of whom over 500 resided in Chicago, in Cook County. The petitioner added as exhibits to his petition files of the daily newspapers of Chicago covering the period since the fire, with all references thereto marked.

On June, 1906, a supplemental petition was filed by the petitioner referring to and making a part thereof all of the averments of the petition for a change of venue filed March 10, 1905, and further alleging that there had existed continually since December 30, 1903, and then existed a great prejudice against petitioner.

Upon the hearing of the motion the petitioner filed 12,150 affidavits signed by men in all walks of life and by large numbers of men prominent in their professions and business and well known reputation; such affidavits were in the following form:

———— ————, of lawful age, being first duly sworn, upon oath deposes and says:

1. That he now is and for many years continuously last past (beginning at a period long before the Iroquois fire hereinafter referred to) has been a resident and citizen of the city of Chicago, in said county and state, and now resides at ———— in said city, and his occupation is that of ———— and his place of business is at ———— street in the said city.

2. That he is not of kin or counsel to the defendant herein.

3. That this affiant is well acquainted and familiar with the occurrence of the fire at the Iroquois Theatre, in said city, on December 30, 1903; and the subsequent developments growing out of such fire; that since said fire, up to and including the present time, this affiant has frequently discussed with and heard discussed, among many of the inhabitants of said county, the occurrences connected with and growing out

of said fire, including the facts and circumstances relating to
the great loss of life in and by reason of said fire, the investi-
gation of the causes of the loss of life by the coroner's jury
in said county, the arrest of said defendant and other persons
connected with said Iroquois Theatre, the hearing before and
the binding over to said criminal court by the coroner of said
county of said defendant herein and others, the closing fol-
lowing said fire, of the theatres in said city by order of the
mayor thereof, the petition for a writ of *habeas corpus* by the
mayor of said city, who on account of said fire had been bound
over by said coroner to the grand jury of said county; the
discharge of said mayor under said writ, the indictment of the
building commissioner of said city and his assistant, and of
the said defendant herein and one Thomas J. Noonan and
one James E. Cummings, the quashing of said indictment
against said Noonan, Cummings and said defendant and the
re-indictment of said defendant, being the present indict-
ment; and has read and seen in the Chicago daily papers, a
great many articles, cartoons, and pictures, detailing and por-
traying the said fire and said loss of life, the progress of said
investigations and prosecution, and the incidents connected
therewith, and other facts and circumstances relating to said
subject-matter, and to the Iroquois Memorial Association
(composed of members of the families that suffered loss of
life in said fire), and detailing also statements purporting to
emanate from persons connected with said association, and re-
citing also the facts and circumstances connected with the
re-opening of said theatre.

4. That this affiant has frequently up to the present time,
talked with many persons, inhabitants of said county, regard-
ing the various matters aforesaid and concerning the guilt or
innocence of those alleged to have been in the management
and control of said theatre, including said defendant, and
that from said publications as aforesaid, and from said facts
and circumstances hereinbefore detailed, and from said con-
versations, this affiant verily believes and states the fact to be
that great prejudice against said defendant has been occa-
sioned, and is now prevalent in the minds of the inhabitants

of said Cook county, and this affiant verily believes and states the fact to be that said defendant will not and cannot possibly receive a fair and impartial trial in the above entitled cause of *People v. Davis,* now pending in the criminal court of said Cook county, because the inhabitants of said Cook county are now prejudiced against him, said Davis.

And further affiant saith not.

The state in opposition to the motion filed about 4,000 affidavits in the following form:

——— ———, being first duly sworn, upon oath deposes and says:

That he now is and for many years continuously last past has been a resident, inhabitant and citizen of the city of Chicago, in said county of Cook, in said state, and now resides at ——— in said city, and his occupation is that of ——— and his place of business is at ——— street in the said city.

That this affiant has knowledge of and is generally familiar with the occurrence of the fire at the Iroquois Theatre, in said city, on December 30, 1903; and the subsequent developments growing out of such fire; that since said fire, this affiant has frequently discussed with and heard discussed, among different inhabitants of said Cook county, occurrences connected with and growing out of said fire, including the facts and circumstances relating to the loss of about 600 lives in and from said fire, and the indictment of said defendant, William J. Davis, and has seen and read newspaper accounts of said fire.

That this affiant has very frequently talked with different inhabitants of said Cook county, regarding said fire and concerning the guilt or innocence of those alleged to have been in the management and control of said Iroquois Theatre at the time of said fire, including said defendant, and that from said publications as aforesaid, and from said facts and circumstances hereinbefore detailed, and from said talks had with said persons this affiant states that in his opinion there exists now no prejudice on the part of the inhabitants of Cook county, Illinois, against William J. Davis sufficient to

prevent him from receiving a fair and impartial trial in the above entitled cause of *People v. Davis*, now pending in the criminal court of said Cook county.

And further affiant saith not.

*Moran, Mayer & Meyer* for petitioner. (*Levy Mayer* and *Alfred S. Austrian*, of counsel.)

1. The petitioner is entitled to a fair and impartial trial. (a) By constitution and statutes. Sec. 9, art. 2, constitution of Illinois; secs. 18, 22, ch. 146, Revised Statutes of Illinois; *Clark v. People*, 1 Scam. 117, 120; *Riggen v. Commonwealth*, 3 Bush (66 Ky.) 494. (b) At common law. 4 Encl. Pl. & Pr. 397; *State v. Burris*, 4 Harr. (Del.) 582.

2. The right to a fair and impartial trial should not be affected by suggestions or arguments of inconvenience or delay. *Wormley v. Commonwealth*, 10 Gratt. (Va.) 658, 662; 4 Encl. Pl. & Pr. 397, note 4.

3. The right to a change of venue must be liberally interpreted. *Packwood v. State*, 24 Ore. 261, 33 Pac. 674; *Price v. State*, 8 Gill (Md.) 296, 302; *Gardner v. State*, 25 Md. 146, 152; 4 Encl. Pl. & Pr. 380, 381. And in case of a doubt it is best to resolve it in favor of the application for a change of venue. *State v. Gray*, 113 La. 671, 37 So. 597.

4. There are many strong illustrations where the evidence shows that there were reasonable grounds to believe that the defendant could not have a fair trial even though there were a large number of negative affidavits showing that he could have a fair trial. *Alarcon v. State* (Tex. Cr. App.), 83 S. W. 1115; *Seams v. State*, 84 Ala. 410, 4 So. 521; *Johnson v. Commonwealth*, 82 Ky. 116; *Posey v. State*, 73 Ala. 490, 494; *People v. Long Island R. Co.*, 4 Parker's Crim. Repts. 602; *Commonwealth v. Ronemus*, 205 Pa. 420, 54 Atl. 1095; *State v. Billings*, 77 Iowa, 417, 423, 47 N. W. 456. Notoriety of a case and aroused feelings of the people are to be considered. *Alarcon v. State* (Tex. Cr. App.), 83 S. W. 1115; *Richmond v. State*, 16 Neb. 388, 20 N. W. 282. The passions only slumber and may break out again at any moment. *Commonwealth v. Ronemus*, 205 Pa. 420, 54 Atl. 1095. "When a proper case

is presented, to refuse such a change of the place of trial would be mob law inside instead of outside the court house." *Garcia v. State,* 34 Fla. 311, 16 So. 223, 228.

5. Affidavits of leading citizens have great weight, and counter-affidavits which simply say that there is no prejudice that will prevent a fair and impartial trial and do not controvert the particular facts alleged in the affidavits for the change are of little avail. *Richmond v. State,* 16 Neb. 388, 20 N. W. 282; *Hickmam v. People,* 137 Ill. 75; *State v. Billings,* 77 Iowa, 417, 423, 42 N. W. 456.

6. The overwhelming number of affidavits filed on behalf of the petitioner entitles him to the change of venue from Cook county. The petitioner files 12,150 affidavits for the change while the state files only about 4,000 counter-affidavits.

*John J. Healy,* state's attorney, and *Harry Olsen,* assistant state's attorney, for the people.

Mere numbers of affidavits should not control. *MacDonald v. People,* 49 Ill. App. 357.

SMITH, J.:—

The court has given this matter very careful consideration. The question now before the court seems to be whether or not such prejudice now exists in the minds of the inhabitants of this county that this defendant cannot get a fair and impartial trial in this county. And in the consideration of that question it is brought to the attention of the court that on a former indictment against this defendant for the same offense a change of venue was allowed to another county with, as I understand, no opposition; that it has been substantially conceded by the state, up to about a year ago, that there was such a prejudice that the defendant would be entitled to a change of venue. Therefore, about the only question that is left to the court is whether or not during the past year there has been a change so that at the present time any feeling of prejudice against this defendant has so abated that he could now safely go to trial in this county.

It would seem that there are very few occasions that in a great city like this a man would be entitled to a change of

venue. So far as we can look forward and anticipate cases it is very seldom that circumstances arise that would make a situation in a great cosmopolitan city where a man would not get a fair and impartial trial. But it does seem on the other hand that if there were a case, a case similar to this would entitle a man to a change of venue. In a horrible catastrophe such as this was, where some six hundred lives were lost, I undertake to say that there is hardly a neighborhood in the city of Chicago and Cook county but what has some victim of that terrible fire, and it would seem to the court that a jury from this county would be influenced more or less, many of them, by the fact that their neighbors or their friends were interested in the outcome of this suit. However that may be, the court is confronted with a record here that seems to the court to allow but one conclusion. The defense has presented over twelve thousand affidavits in this case as to the prejudice, and the state something like four thousand. Now, while we all concede that it is not a matter of numbers, because if it were numbers that govern that would simply mean a contest in many counties between opposing factions until you get a majority of the people of an entire county who would testify one way or the other, but in this case there are over twelve thousand affidavits presented to the court; among them are hundreds and thousands of men who stand high, foremost citizens of the state, intelligent, the peers of any, men high in their efforts to enforce law and order, and it is difficult for the court to say that these men, prominent, influential citizens of Chicago, who come into this court and under oath testify, for that is substantially what they do, that this defendant cannot receive a fair and impartial trial on account of the prejudice of the inhabitants of this county—they must be entitled to some credence. Such men as Judge Payne, Dr. Emil Hirsch, Dr. Frank Billings, and hundreds of others, men who ought to know, men who it would seem would know what the situation is in this county, the court will hardly assume that these men are testifying to something that they know nothing about, or wilfully testifying to something that is not true. And with the testimony of so many men of in-

fluence and standing, so high in the community, it leaves the court nothing else to do on this record but grant a change of venue. Men of that character and in such vast numbers, puts the court in a position that this community is in such condition and frame of mind that their testimony cannot be ignored by the court on the record that is made here, and the motion will therefore be allowed.

As to the county, counsel may confer upon that. The court will say this, however, that the court will not send it to any remote county in the state and not send it to any county except some county that can be easily reached from Chicago, that will be accessible and convenient. If counsel can agree upon such a county it will be perfectly satisfactory to the court, and if they cannot the court will determine.